market, especially because Shell and Statoil refused to clarify their intentions. This situation is one of many in which other market players are expected to believe that major traders are trading in the MOC in pursuit of clarity and discovery of price, without any factual support or indication of what is truly happening to the large, market-moving volumes of oil involved.

161.    Shell and Statoil's conduct impacted prices and trends for Dated Brent and for Brent futures contracts. On September 13, 2012, the Brent October futures contract expired at a $1.01 per barrel premium to November. This backwardation was at levels much higher than earlier in the month and was the consequence of the booking of the VLCCs by both Shell and Statoil. That is, the reported bookings of these large tankers squeezed the nearby futures since the market interpreted the loading out of large amounts of Brent Crude from the North Sea in October to be a bullish pricing factor.

162.    Because of the perceived tightness in the market from the reported VLCC bookings, Dated Brent prices increased on September 13, 2012. BP offered Forties at plus $0.17 over North Sea Dated Strip but withdrew the offer in the MOC. Given this offer and other intangible factors, such as the VLCC cargoes and the effects on the futures markets, Platts raised Forties by $0.135.

163.    On September 14, 2012, the market continued to climb based on these same intangible reports.

164.    On September 17, 2012, Shell and Statoil's reported VLCC bookings continued to cause inflation to the market. Forties increased to plus $0.065 over the North Sea Dated Strip. Contemporaneously, Defendant Phibro created upward pressure in the Forties when it purchased a Forties cargo for October 3 to October 5, 2012 for $0.05 plus North Sea Dated Strip.

**3. Late Month Suppression**

43

165.    BP's sale of the cargo to Phibro on September 17, 2012, initiated a manipulation of the Dated Brent downward. Defendants' collusive market manipulation continued to create artificial price trends for Dated Brent.

166.    The very next day, September 18, 2012, Phibro, with the help of other market participants, drove the market downward by offering in the MOC the very same cargo that it bought the day before at minus $0.25 below North Sea Dated Strip, a full $0.30 below its purported purchase price 24-hours earlier. At this price, there were no bids from others in the MOC process. In response, Platts assessed Forties to minus $0.245 under the North Sea Dated Strip. Phibro was not acting rationally by offering the cargo it had just bought. Rather, Phibro deliberately was signaling to market participants that the market was heading lower.

167.    By the following week the Brent market was chaos, due, in substantial part, to Shell's manipulative conduct. On September 24, 2012, Shell led a sell-off, in a market devoid of transparency. As one trader described it, "It's hard to get an opinion on the fundamentals . . . ." Another trader described the market as full of "a lot of lies." In this informational vacuum, Shell made sure that there were no buyers in the market. The one bid in the MOC process on September 24, 2012 had been from Total Oil for an October 13 to October 17, 2012 loading period. Shell sold Total Oil the cargo and removed the only supporting price from the MOC. After Shell sold this cargo to Total Oil, there were no bidders to take the three Forties and two Ekofisk cargo offered in the market, many of which were offered by Shell. Shell, offering the Forties cargoes, pushed Dated Brent down substantially. Dated Brent, which priced off the Forties, fell an astounding $0.375 on that day to minus $0.325 under North Sea Dated Strip. This was the largest one-day fall in the Forties crude prices since June 12, 2012. Because of this move,

1141196.4

Dated Brent fell to a $0.43 contango to second month [November] Cash BFOE, the widest since mid-July.

168.     On September 25, 2012, Shell continued to use manipulation to depress the Dated Brent market. On this day it engaged in a wash trade with Trafigura. Shell offered a Forties cargo (designated "F1005") for loading October 10 to October 12 at North Sea Dated Strip minus $0.30. Trafigura reportedly purchased this parcel. As a result of this trade, Platts assessed Dated Brent at North Sea Dated Strip minus $0.285. The trade between Trafigura and Shell was a wash trade intended solely to influence the MOC process and prices of Dated Brent. The trade served no other economically justifiable or rational purpose.

169.     On the following day, September 26, 2012, Shell mistakenly offered the F1005 cargo for loading at October 10 to October 12. It quickly withdrew this offer. The offer surprised the majority of North Sea crude traders, as Shell had just sold that same cargo to Trafigura the previous day. Shell also kept a cargo that it held from another trader for loading October 21 to October 23.

170.     By September 26, 2012, Shell held least 10 of the 16 Forties cargoes loading October and five of the seven Brent cargoes, making it the major stakeholder in October's BFOE market. In other words, at the end of September 2012, Shell had market power and a monopolistic position in the Brent market. Shell used its market power to depress prices. The reason Shell intended to depress prices, and the reason it had acquired a dominant position in the BFOE market, was to advantage its other trading positions in derivatives – *e.g.*, CFDs and futures.

171.     On September 26, 2012, the Brent futures markets displayed strength in the nearby futures to the point of backwardation. For this reason, the Forties differential was

45

assessed at North Sea Date Strip minus $0.24, up 4.5 cents on that day, in line with the futures backwardation and a steeper CFD market. The Forties market did not necessarily manifest the same strength because of Shell's and other defendants' conduct. Indeed, the weakness in the Forties was considered illusory to some traders, who joked, "Forties traded lower so the Brent [futures] spread rallied." In fact, Shell had manipulated the Forties market (and BFOE market generally) in order to advantage itself in its related derivatives positions, including in the CFD and futures markets as well as in its arbitrage positions with Dubai Crude, discussed below.

172. By September 27, 2012, Shell had at least 12 of the 17 Forties cargoes loading in October. There were no bids or offers in the MOC assessment process. Platts therefore assessed Dated Brent in line with the Brent futures structure. Platts noted that there was significant strength in the November Brent market relative to its weakness in October. Thus, as Shell's position became known, Forties stabilized, and notably the physical arbitrage of Dated Brent relative to Dubai Crude was closing (as alleged more fully below).

173. On Friday, September 28, 2012, despite the strength in the November Brent physical market, certain BFOE players continued their efforts to depress the October Brent market. Shell spoofed the market by reoffering its same Forties cargo (F1005) for loading October 10 to October 12, then withdrawing it. In Shell's place as the maker of artificial prices in the MOC process, Vitol sold Trafigura a cargo for loading October 11 to October 13 at North Sea Dated Strip minus $0.55. Remarkably, this price was $0.34 below Platts' Thursday assessment for the same loading period. Vitol's trade was used as an overhang to the Brent market, even though, aside from these Forties offers, the Brent crude market was much more tightly priced. Because of this artificial trade Platts assessed Forties almost $0.30 below the previous day's figure, at North Sea Dated Strip minus $0.46.

46

174. In sum, on September 28, 2012, Shell attempted to bluff the re-offer of the October 10 to October 12 cargo (the object of the manipulative trade with Trafigura) to find no buyer but Vitol. Trafigura executed a trade which Plaintiffs believe was manufactured by those participating in the South Korean arbitrage (or those with synthetic arbitrage positions constructed from futures or other derivatives). At this time Shell was lacking in credibility and coincident interests of Vitol manufactured a bogus trade.

175. Overall, for the month of September 2012, out of 33 offers reported by Platts, 21 came from BP (in the first half of September), 6 came from Shell (mostly in the last half of September) and two from Vitol on September 24, 2012. These three companies made 88 percent of the offers in the market in this month, which saw an unreasonable and artificial suppression of the Dated Brent benchmark at the beginning and the end of the month. Likewise, Vitol, Shell and BP sold the vast majority of the cargoes reported as having traded in the MOC process for September. And Shell, BP and Vitol were responsible for the vast majority of the sales in the CFD MOC process for the month of September.

176. The conduct of Shell, BP, Statoil, Trafigura, Phibro and Vitol during this month impacted pricing trends of Dated Brent and the prices of Brent futures in substantial ways, including by affecting the differential between Brent futures and WTI futures.

177. The activity of BP and Shell and others in the Platts MOC process during September 2012 constitutes uneconomic and manipulative behavior. The manipulation was designed to and did affect the relative BFOE prices in terms of time spreads (the forward curve) and geographic arbitrage (shipments to Korea, the U.S., etc., and both physical and derivatives arbitrage). This is evidenced by the large (at least 5 million barrel) short derivatives position BP established, which priced directly against the Platts quotations that were being manipulated. It is

47

further evidenced by the large physical cargo position accumulated by Shell as it manipulated prices lower.

178.    Defendants manipulated time spreads in several ways. For example, as discussed above, the manipulative activity caused the October-November ICE Brent spread to rise to 58 cents/barrel by 4:30 p.m. London time Wednesday, September 12, 2012. This futures movement occurred at the same time that the CFD differentials increased in the MOC process. Many oil traders expressed surprise at this strength. One stated: "How on earth can the spread be so high," said one trader. "Someone is very bullish the paper but that doesn't make sense . . . the physical market continues to struggle." "It was all paper-driven," said a second trader, noting that Brent intermonth spreads had lowered at the end of the day from their previous intraday highs. Adding to this confusion was is the fact that at the same time Forties was experiencing cargo deferrals. This was particularly confusing because BP, via the Forties Pipeline System, was the scheduler of Forties cargoes, and BP did nothing to clarify the Forties scheduling.

### G.    The Dubai/Brent Manipulation

179.    Defendants also manipulated Dated Brent and price trends in order to affect geographic arbitrage of physical cargoes. Regarding inter-regional physical arbitrage, Defendants joined together and agreed in September to either promote or discount the movement of BFOE oil out of the North Sea region. On several occasions traders inquired as to whether Brent Crude Oil was priced to move to the Korean market. Throughout the beginning of September traders discussed the possibility of this arbitrage, including the fixing of VLCCs by Statoil and Shell to ship Brent Crude Oil to Korea. The depression of prices in the early part of the month created the opportunity for Shell and Statoil to accumulate cargoes.

180.    Then, on September 13, 2012, the expiry of the October ICE Brent futures contract coincided with two VLCC exports from the North Sea to South Korea planned for

48

October. As a consequence, October futures expired at a $1.01 per barrel premium to November by 4:30 p.m. London time. Demonstrating the artificiality of the pricing, traders commented that the level of backwardation in October and November was much higher than seen earlier this month even as the physical market had remained weak due to a lack of demand from European refiners amid the maintenance season. "Backwardation is picking up but it's all over the place," said one trader. "It's hard to know whether that's driven by physical market strength or not." A second trader said: "I can't read the physical at the moment . . . it looks a touch heavy if anything, even with the cargoes going East." To effect this manipulation, Shell fixed a VLCC, the Pu Tuo San, to leave Scotland between October 10 and 15. Statoil's VLCC was set to sail from Norway between October 14 and 15. Notably, trading sources at Shell and Statoil declined to comment on the cargo movements. Shell and Statoil's manipulative use of the VLCC had artificially influenced the market.

181.    The activity of Shell, BP and others during the month of September was overall designed to lower the Dated Brent premium relative to Dubai Crude and thereby force open the physical arbitrage.

182.    Dubai Crude is the primary crude oil benchmark against which other grades of crude oil are referenced in the Asian markets. The Dated Brent benchmark in Northwest Europe ("NWE") generally trades at a premium to the Dubai benchmark. Thus, the lower the Brent premium to Dubai is, the more possible is the physical arbitrage movement from NWE to South Korea.

183.    The relationship between Brent and Dubai Crude Oil is shown below, with the Brent manipulation downward at the beginning of September apparent along with the end of the

manipulation at the end of the month. The bogus trades of the September 25 and September 28 described above are particularly obvious here.



| Date | Brent/Dubai |
|---|---|
| 8/17/2012 | 3.20 |
| 8/21/2012 | 3.08 |
| 8/22/2012 | 2.96 |
| 8/23/2012 | 3.12 |
| 8/24/2012 | 3.32 |
| 8/27/2012 | 3.12 |
| 8/28/2012 | 2.94 |
| 8/29/2012 | 2.72 |
| 8/30/2012 | 2.77 |
| 8/31/2012 | 2.97 |
| 9/3/2012 | 2.22 |
| 9/4/2012 | 2.09 |
| 9/5/2012 | 2.11 |
| 9/6/2012 | 1.89 |
| 9/7/2012 | 1.77 |
| 9/10/2012 | 1.67 |
| 9/11/2012 | 1.48 |
| 9/12/2012 | 1.77 |
| 9/13/2012 | 1.54 |
| 9/14/2012 | 2.13 |
| 9/17/2012 | 1.99 |
| 9/18/2012 | 1.91 |
| 9/19/2012 | 2.04 |
| 9/20/2012 | 1.97 |
| 9/21/2012 | 2.21 |
| 9/24/2012 | 2.44 |
| 9/25/2012 | 2.01 |
| 9/26/2012 | 2.03 |
| 9/27/2012 | 2.39 |
| 9/28/2012 | 1.93 |
| 10/1/2012 | 1.70 |
| 10/2/2012 | 1.84 |
| 10/3/2012 | 1.92 |
| 10/4/2012 | 1.87 |
| 10/5/2012 | 2.41 |
| 10/8/2012 | 2.49 |
| 10/9/2012 | 2.81 |
| 10/10/2012 | 2.89 |
| 10/11/2012 | 3.16 |
| 10/12/2012 | 2.86 |
| 10/15/2012 | 3.04 |

1141196.4

184.    On October 1, 2012, the market finally recognized the fundamental situation with Shell as the main owner in the Platts 10-25 day window. The depressed market rebounded on this day. "The prompt was clearly looking a bit distressed but I'm not sure you can say that anymore," said a trader after the Platts MOC assessment process. "There is only one owner really and they clearly don't want to sell at these levels," another trader said of Shell and its physical position in Forties. Shell held almost every cargo in the last two thirds of October.

## H.    The Urals Benchmark Manipulation

185.    The activity by Shell in the Brent MOC was not its only activity designed to manipulate relative prices for crude oil grades in September 2012. Shell is also an active participant in the Platts MOC for Russian Crude Oil (known as Urals crude oil). This Urals MOC is designed to fix relative values for Urals crude oil in both NWE and the Mediterranean. Shell attempted to manipulate the relative value of Urals crude oil in NWE which is the only other significant Northern European price benchmark. Urals crude oil is of comparative quality to Forties crude oil. The two blends are often viewed as substitutes for each other when comparative differentials and refinery margins permit. Urals crude oil in NWE has influence on inter-regional arbitrage pricing as do BFOE prices.

186.    On September 13, 2012 in the Platts Urals MOC Shell sold to Statoil a cargo (720MB) of Urals crude oil ex Primorsk or Ust Luga October 1 to October 5, 2012 at a differential to Dated Brent of $1.85. This trade was so out of line with market fundamentals that in this rare instance, Platts was not able to manufacture any purported legitimate reason to accommodate the trade with an exception and was forced to discard this "uncompetitive" trade by Shell from the value calculation for the day.

187.    Thus, while Shell was intending to manipulate Dated Brent, it also was attempting to artificially influence the only other benchmark with similar characteristics to Brent.

1141196.4

## I. By Manipulating Dated Brent and Brent Crude Oil Prices Defendants Also Manipulated Brent Crude Oil Futures Prices

188.    Brent Crude Oil futures contract prices are inextricably and mathematically linked to Platts' and other PRAs' pricing assessments of market participants' transactions. Therefore, reporting inaccurate or misleading Dated Brent and Brent Crude Oil transactional prices also results in artificial prices for the Brent Crude Oil futures contracts and other related derivative contracts.

189.    A commodity futures contract is a standardized agreement to buy or sell a commodity, such as Brent Crude Oil, at a date in the future. Futures contracts have two sides: The "long" side is the buyer of the contract who is obligated to take delivery and pay for the commodity if the buyer holds the contract until the specified delivery date. The "short" side is the seller of the contract who is obligated to make delivery of the commodity on the delivery date.

190.    The Brent Crude Oil futures market can be thought of as a clearinghouse for trades among buyers and sellers of Brent Crude Oil futures contracts, which are standardized contracts used to price Brent Crude Oil at various maturities. The Brent Crude Oil futures market is inextricably linked to the market for Brent Crude Oil and thus to Platts pricing, and price movements in the spot market can and do cause price movements in the futures markets.

191.    Brent ICE futures use media reports to derive the price of the futures contract, and Platts is the primary media source for Brent pricing.

192.    Brent Crude Oil futures traders, like Plaintiffs, refer to the prices published by Platts and the other PRAs for price discovery and for assessing price risks in the Brent Crude Oil market. An increase in the price published by Platts signals either stronger demand or weakened supply, and futures traders take account of both price movements and changes in the

53

supply/demand balance when conducting their futures trading. This price impact is expected. Brent Crude Oil futures overlay the conventions and conditions of the Brent Crude Oil spot market. Generally and including during the Class Period, Brent Crude Oil futures prices derive their valuation from observable transactions. A bid or offer in the market is the first point in a commercial transaction. Brent Crude Oil spot and futures prices move in the same direction. That is why futures markets are used to hedge price exposure.

193. This is just another way of expressing the integrated characteristics and thus arbitrage realities of the price of Brent Crude Oil. Pricing trends in the Brent Crude Oil spot directly affect Brent Crude Oil futures. The expiration (or conversion) of a Brent Crude Oil futures contract into a physical position also results in the convergence of price especially when the spot price sets the futures expiration price. The physical delivery mechanism ensures price convergence between the spot and futures market. When these high correlations or conversions are disrupted by the manipulation of prices (creating false values/prices), *i.e.*, a manipulation of the Platts Brent Crude Oil benchmarks, it has effects that ripple throughout the Brent Crude Oil and futures market. Examining the differentials between the prices of Brent and WTI futures is one way to detect how manipulation of physical Brent Crude Oil affects futures prices.

194. Because it is the most important price marker for Brent Crude Oil in the world, Dated Brent, and thus the integrity of the Platts MOC, is paramount. As such, manipulation of Platts' price assessments of Brent Crude Oil artificially affects the price of Brent Crude Oil futures contracts.

195. Not all futures contracts traded each year result in delivery of the underlying commodities. Instead, traders generally can offset their futures positions before their contracts mature. For example, a purchaser of a futures contract can cancel or offset his or her future

54

obligation to the contract market/exchange clearinghouse to take delivery of crude oil by selling an offsetting futures contract. The difference between the initial purchase or sale price and the price of the offsetting transactions represents the realized profit or loss.

196. Futures markets like NYMEX and ICE are specifically designed to facilitate and ease trading in one central marketplace for traders who are located throughout the United States and the world.

## 1. NYMEX

197. NYMEX is a designated contract market under Section 5(b) of the CEA, 7 U.S.C. § 7(b). NYMEX is the world's largest physical commodity futures exchange and the preeminent forum for energy. There are a number of futures contracts based on the Brent Crude Oil benchmark that can be purchased or sold on NYMEX.

198. These contracts are transacted electronically on the Chicago Mercantile Exchange ("CME") Globex and CME ClearPort trading platforms. Globex is an electronic trading platform owned by the CME Group, the parent company of NYMEX.

199. In addition to trading on electronic platforms, many futures contracts such as the Brent Crude Oil Last Day Futures (BZ) and the Brent Financial Futures (CY) trade through open outcry at the NYMEX in New York. Open outcry is a method of public auction for making bids and offers in the trading pits of the futures exchange.

200. NYMEX futures contracts priced, settled or benchmarked to Brent Crude Oil include:

a. Brent Crude Oil Last Day Financial Futures (BZ) – Final settlement, following termination of trading for a contract month, is based on the Floating Price. The

Floating Price is equal to the ICE Brent Crude Oil Index price as published one day after the final trading day for the delivery month.

b.       Brent Financial Futures (CY) - Final settlement, following termination of trading for a contract month, is based on the Floating Price. The Floating Price for each contract month is equal to the arithmetic average of the ICE Brent Crude Oil Futures first nearby contract settlement prices for each business day that it is determined during the contract month.

c.       Brent Crude Oil Penultimate Financial Futures (BB) – Final settlement, following termination of trading for a contract month, is based on the Floating Price. The Floating Price is equal to the ICE Brent Crude Oil Futures' first nearby contract settlement price on the penultimate trading day for the delivery month.

d.       Brent Crude Oil vs. Dubai Crude Oil (Platts) Futures (DB) – Final settlement, following termination of trading for a contract month, is based on the Floating Price. The Floating Price for each contract month is the arithmetic average of the ICE Brent Crude Oil Futures first nearby contract settlement price minus the mid-point between the high and low quotations from Platts Crude Oil Marketwire for the Dubai front month price for each business day during the contract month.

e.       WTI-Brent Financial Futures (BK) - Final settlement, following termination of trading for a contract month, is based on the Floating Price. The Floating Price for each contract month is the arithmetic average of the Light Sweet Crude Oil first nearby contract settlement price for each business day that it is determined minus the ICE Brent Crude Oil Futures first nearby contract settlement price for each business day that it is determined during the contract month.

201.    These contracts trade in 1,000 barrel increments with prices quoted in U.S. dollars and cents per barrel.

202.    Defendants purposefully manipulated prices of Brent Crude Oil and Brent Crude Oil futures contracts on NYMEX through their deliberate and systematic submission of false Brent Crude Oil trade information to Platts.

203.    Defendants knew that false trade information was used by Platts to calculate and publish its Brent Crude Oil prices.

204.    Defendants also knew, as sophisticated market participants, that the information (and misinformation) they provided directly impacted the prices of Brent Crude Oil futures contracts and other Brent Crude Oil derivative contracts traded in the United States and elsewhere. Through the conduct alleged herein, Defendants intentionally and recklessly caused prices of Brent Crude Oil and Brent Crude Oil futures contracts to trade at artificial levels.

### 2.    ICE

205.    ICE is the second largest regulated energy futures exchange in the world.

206.    In June 2001, ICE acquired International Petroleum Exchange of London Limited ("IPE"), one of the world's largest energy futures and options exchanges. The IPE's flagship commodity, Brent Crude Oil, was a world benchmark for oil prices.

207.    Brent Crude Oil futures contracts were traded via open outcry on the floor of the IPE until April 7, 2005, when its name was changed to ICE Futures and all trading in Brent Crude Oil futures on ICE was shifted onto an electronic trading platform. ICE Futures is the world's largest host of crude and refined oil futures trading. The ICE Brent Crude Oil Futures contract is relied upon to price two-thirds of the world's physical crude oil.

1141196.4

208. As on the NYMEX, ICE Brent Crude Oil futures contracts trade in 1,000 barrel increments.

209. ICE is regulated by the U.K. Financial Conduct Authority, with additional oversight by the U.S. Commodity Futures Trading Commission for linked contracts.

210. The ICE Brent futures contract is traded at ICE Futures Europe and executed on the WebICE trading platform, which is distributed in more than 70 countries, including the U.S. In 1999, ICE obtained the CFTC's permission to install computer terminals in the United States to permit traders in New York and other U.S. cities to trade European energy commodities through the ICE Exchange. In January 2006, the CFTC further permitted ICE to use its trading terminals in the United States for the trading of U.S. crude oil futures on the ICE Futures exchange.

211. The ICE Brent futures contract is a deliverable contract based on "exchange for physical" or "EFP" delivery with an option to cash settle, using the ICE Brent Index price for the day following the last trading day of the futures contract. Prices of ICE Brent Crude Oil Futures contracts are quoted in U.S. dollars and cents per barrel. Trading in ICE Brent Crude Oil Futures contract terminates at the end of the designated settlement period on the Business Day immediately preceding: (i) either the 15th day before the first day of the contract month, if such 15th day is a Business Day; or (ii) if such 15th day is not a Business Day, the next preceding Business Day.

212. The ICE Brent Crude Oil futures contract was developed in 1988 when the Brent crude oil physical market was trading on a 15-day basis. The expiry calendar established at that point, which continues today for existing ICE Brent Crude Oil futures, reflected the 15-day timetable. Existing ICE Brent Crude Oil futures therefore currently expire 10 days after BFOE

contracts have started to go "wet," *i.e.*, to turn into specific Dated Brent contracts with respect to the contract delivery month in question.

213.    According to ICE, the "ICE Brent futures contract is based on the underlying physical BFOE market," and the "ICE Brent futures contract is linked to forward BFOE contracts and hence the underlying Dated Brent market by the [EFP] mechanism. The contract settles against the ICE Brent Index price for the day following the last trading day of the Brent futures contract. At expiry of a Brent futures contract, the index price is based on the average value of BFOE cash cargoes on expiry day. The Index is also calculated by the exchange every day."

214.    Further, ICE's corporate website states that "[t]he cash settlement price for ICE Brent . . . is based on the ICE Brent Index at their respective expiries. The index represents the average price of trading in the 25-day "cash" BFOE market in the relevant delivery month as reported and confirmed by the industry media [e.g., Platts]. . . . The index is calculated by the Exchange as an average of the following elements:

      a.    A weighted average of first month cargo trades in the 25-day BFOE market;

      b.    A weighted average of second month cargo trades in the 25-day BFOE market plus a straight average of the spread trades between the first and second months; and

      c.    A straight average of designated assessments published in media reports [*e.g.*, Platts]."

1141196.4

215. In response to Platts extending its assessment period to a 10 to 25 day period, ICE launched the ICE Brent NX Brent futures contract, which has an expiry calendar based on the 25-Day BFOE market, which aligns the futures expiry calendar with the physical BFOE market.

### 3. Defendants Manipulated Brent Crude Oil Futures Prices

216. Defendants purposefully manipulated prices of Brent Crude Oil and Brent Crude Oil futures contracts through their deliberate and systematic submission of false Brent Crude Oil trade information to Platts.

217. Defendants knew that this false trade information was used by Platts in calculating and publishing its Brent Crude Oil prices.

218. Defendants traded substantial volumes of Brent Crude Oil futures. Defendants knew, as sophisticated market participants, that the (mis)information they provided directly impacted the prices of Brent Crude Oil futures contracts and other Brent Crude Oil derivative contracts traded in the United States and elsewhere. Through the conduct alleged herein, Defendants intentionally and recklessly caused prices of Brent Crude Oil and Brent Crude Oil futures contracts to trade at artificial levels. This manipulation had the effect of benefitting Defendants' positions in the Brent Crude Oil futures.

219. As major oil market participants, Defendants have the motive and financial incentive to manipulate Brent Crude Oil prices through contrived reports to Platts and other PRAs. Such manipulation: (a) enhances the value of Defendants' financial or derivative or physical positions, and (b) improves the price of purchase or sale obligations. Each Defendant's production, sales, trading and other participation in the financial, derivative or physical crude oil market are connected with or based on prices of Brent Crude oil.

1141196.4

220. Defendants' BP, Shell, and Statoil's key positions in the sales points for three of the four physical markets allows them individually and even more so collectively to enjoy privileged positions along the supply chain which gives them access to critical and valuable nonpublic information. They are better informed about current and future supply and demand balances and flows that are not available to the markets at large. Defendants can and do exploit this asymmetry of information to the disadvantage of other market participants, including traders in futures contracts.

221. As holders of this advantageous non-public information, Defendants are well positioned to influence the market. Market participants will follow Defendants' lead from their conduct in the market. Defendants have used this power, coupled with their ability to influence the MOC process, to manipulate Dated Brent and Brent futures contracts.

222. Each Defendant trades substantial volumes that are provided to Platts. This includes reports of significant physical, financial or derivative transactions, including transactions with one another and other firms they know. Defendants and other market participants are under no legal or regulatory obligation to provide their deals to Platts, but the industry heavily relies upon Platts and other PRAs to interpret and publish prices. IOSCO conducted a study and concluded in October 2012 that price assessments could be vulnerable to manipulation because traders participate voluntarily, meaning they may selectively submit only trades that benefit their positions, in violation of the Platts rules.

223. During the Class Period, Brent Crude oil prices indicate repeated distortions that are consistent with contrived reporting to move prices.

224. For example, in addition to the distortions set forth above, during the five-year time period between approximately June 2008 and June 2013, the average change in the ICE

Brent Index price on ICE Brent Crude oil futures settlement days (i.e., the trading day following the last day of trading, or "expiration day," of the ICE Brent Crude oil futures contract) was substantially greater than the average change in the ICE Brent Index price on non-settlement days.

225.    Additionally, during the two year period from July 1, 2008 through June 30, 2010, the average change in the ICE Brent Index price on ICE Brent Crude Oil futures settlement days was substantially greater than the average change in the ICE Brent Index price on non-settlement days.

226.    Moreover, there have been recurring instances of substantial price movements on Brent settlement dates including movements in the price for Dated Brent.

227.    The news flow and fundamentals of supply and demand for Brent Crude oil pricing did not remotely support or justify the foregoing repeated distortions. Contrived reporting by market participants in their submissions to the price reporting services caused the distortions.

**4.    Regulatory and Enforcement Actions Involving Defendants**

228.    Defendants Shell, BP and Statoil have recently publicly stated that they have been raided by the EC in order to obtain documents relating to an investigation of, among other things, contrived reporting of crude oil prices to Platts.

229.    On May 17, 2013, the Chairman of the U.S. Senate's Energy Committee requested that the Department of Justice join the investigation into potential crude oil market manipulation, including the impact on the U.S. market.

230.    In addition, on June 24, 2013, the U.S. Federal Trade Commission ("FTC") opened a formal investigation into how prices of crude oil and petroleum-derived products are set. The FTC investigation reportedly mirrors the European Commission inquiry.

1141196.4

231. The EC has stated publicly that it has

concerns that the companies may have colluded in reporting distorted prices to a Price Reporting Agency to manipulate the published prices for a number of oil and biofuel products. Furthermore, the Commission has concerns that the companies may have prevented others from participating in the price assessment process, with a view to distorting published prices.[1]

232. Collusively contrived reporting to Platts increases the odds that the false reports will be published because if two participants report the same number to Platts or otherwise support or confirm such number to Platts, it is more likely to be published.

233. Each Defendant simultaneously engaged in the parallel, highly unusual and unlawful act of restraining trade by submitting contrived reports to Platts and other PRAs in order to move these benchmark prices and, therefore, the Brent Crude Oil futures contract and options prices. As a direct and foreseeable result, all such prices were repeatedly distorted and artificial.

234. A recent article in the *Wall Street Journal* reports statements by various persons who declare or imply that contrived reports are in fact routinely submitted to various price reporting services in order to move energy prices related to Brent Crude Oil:

a. A London-based oil trader asserted that he and others regularly try to profit by placing bets that a benchmark will fall, using futures contracts or swaps, then trying to drive prices down by selling cargoes at below-market prices and reporting the deals to Platts.

b. In some fuel markets, according to traders, so few daily transactions occur that it is possible to sway a day's price with a single trade or series of bids.

c. A Rotterdam-based bunker fuel trader stated that making deals in an effort to move prices is commonplace.

---

[1] *Commission confirms unannounced inspections in oil and biofuels sectors*, European Commission, http://europa.eu/rapid/press-release_MEMO-13-435_en.htm.

63

d.    Defendant BP's traders based in Singapore reportedly "began making high bids within the Platts window, putting upward pressure on the benchmark that affected prices in Australia, according to [3 persons] knowledgeable about the situation. In some instances, the high bids never resulted in deals . . . . In others, the BP traders bought actual shipments at artificially high prices and moved them from Korea to Australia."

235.    The *Wall Street Journal* article further provides:

The Platts 50 ppm benchmark rose from about $70 in early January 2006 to nearly $100 in June. The increase boosted BP's income from diesel it refined and sold in Australia, along with the bonuses of some of BP's Singapore-based oil traders....[2]

236.    Defendants' and others' ability to manipulate prices also has repeatedly been demonstrated through government investigations and private settlements of charges that they moved or manipulated energy prices unlawfully. Defendants were in an excellent position to do so with Brent Crude Oil as well, especially when colluding. And they each had a far greater motive to manipulate Brent Crude Oil prices than other prices.

237.    <u>Defendant Shell</u>: Defendant Shell or one of its subsidiaries has been charged in these relevant actions.

a.    U.S. Federal Energy Regulatory Commission's ("FERC's") Final Report on Price Manipulation in Western Markets, FERC Docket No. PA02-2-000 (March 2003), at III-22 (noting Shell's Coral Energy subsidiary "interviewed all employees who provided data to the [trade publication]" and "concluded that 'the information provided to the trade publication accurately reflected then current market information'" but "Coral does not seem to address the seemingly obvious problem with reporting prices and volumes of trades that traders had 'heard about' or 'seen on electronic trading platforms.'");[3]

b.    Order Instituting Proceedings Pursuant to Sections 6(c) and 6(d) of the Commodity Exchange Act, Making Findings and Imposing Remedial Sanctions, in *In the Matter of Coral Energy Resources, L.P.*, CFTC Docket No 04-21 (assessing civil monetary penalty of$30 million against Shell's Coral Energy subsidiary for manipulating natural gas prices by means of repeatedly making false reports to price index publications) (CFTC Jul. 28, 2004);

---

[2]    Traders Try to Game Platts Oil-Price Benchmarks, WALL STREET J. (Jun. 19, 2013), p. A12.

[3]    http://www.fere.gov/legal/maj-ord-reg/land-docs/PART-1-3-26-03.pdf.

1141196.4

c.	*In re Natural Gas Commodity Litig.*, 337 F. Supp. 2d 498 (S.D.N.Y. 2004) (denying motion to dismiss by defendants, including Shell's Coral Energy subsidiary); Stipulation and Agreement of Settlement in *In re Natural Gas Commodity Litig.*, No. 03 Civ. 6186 (S.D.N.Y.) ($5,147,500 settlement by Shell's Coral Energy Resources, L.P. subsidiary), filed Feb. 16, 2007 (ECF No. 486);

d.	Consent Order of Permanent Injunction and Other Equitable Relief Against Defendants in *CFTC v. Denette Johnson, Courtney Cubbison Moore, John Tracy, Robert Harp, and Kelly Dyer*, Civil Action No. 05 Civ. 3322 (S.D. Tex.), filed Nov. 7, 2007 (ECF No. 137) (permanent injunction and assessment of $1 million penalty).

e.	European Commission Decision C (2006) 4090 Final, Case COMPIF/38.456 - Bitumen - Netherlands (Sept. 13, 2006) (fining 14 companies, including Shell, 266.7 million euros for fixing the price of bitumen, a petroleum byproduct used to make asphalt, over eight years on the Dutch market. The fine imposed on Shell, both a leader of the plan and a repeat offender, was increased for being a repeat offender, Shell received the biggest penalty); 2012/C 355/24T (Sept. 27, 2012) (reducing fine imposed on Shell from 108 million euros to 81 million euros).[4]

238.	Defendant BP: Defendant BP or one of its subsidiaries has been charged in these relevant actions.

a.	Criminal Information and Deferred Prosecution Agreement in *United States v. BP America, Inc.*, 07 CR 683 (N.D. Ill.), filed Oct. 25 and 30, 2007 (ECF Nos. 1, 6) (alleging BP Products North America, Inc., a wholly owned subsidiary of Defendant BP, and its subsidiaries and several employees inflated industry benchmark price of TEPPCO pipeline system propane; detailing terms of cooperation, assessing $100 million penalty and establishing restitution fund of $53.503 million);

b.	United States v. Mark David Radley, James Warren Summers, Cody Dean Claborn and Carrie Kienenberger, 07 CR 689 (N.D. Ill.) (individual traders);

c.	Final Order and Judgment in *In re BP Propane Direct Purchaser Antitrust Litig.*, No. 06 Civ. 3621 (N.D. Ill.), filed May 26, 2009 (ECF No. 182);

d.	Final Order and Judgment in *In re BP Propane Indirect Purchaser Litig.*, No. 06 Civ. 3541 (N.D. Ill.), filed Feb. 10, 2010 (ECF No. 207).

e.	In 2011, FERC pursued BP for "fraudulently trading physical natural gas" and for trading points in order to increase the value of its financial positions. *See* Staff Notice of Alleged Violations, FERC 1 (Aug. 12, 2011)[5] ("BP accomplished its fraud by using

---

[4]	*See Shell Wins 25% Cut in Bitumen Cartel Fine, Total Loses Bid*, Bloomberg Business Week (Sept. 12, 2012), http://www.businessweek.com/news/2012-09-27/shell-wins-25-percent-cut-in-eu-bitumen-cartel-fine-as-total-loses-bid.

[5]	http://www.ferc.gov/enforcement/alleged-violation/notices/bp-america.pdf.

transportation capacity between the two markets [Houston Ship Channel and Katy] uneconomically. In doing so, BP contributed to lower HSC Gas Daily indices to increase the value of its financial positions by making early and repeated sales; using high market concentrations; and by trading relationally to its financial spread.").

       f.    In the EC bitumen price-fixing matter, Defendant BP p.l.c. escaped a fine because it cooperated in the probe into the bitumen cartel.[6]

## J.    Defendants Trade Brent Crude Oil Futures and Derivative Contracts

239.    Defendants and their affiliates actively trade Brent Crude Oil futures contracts and other Brent Crude Oil derivative contracts in the U.S. Defendants' manipulative actions comes both in the form of trading for profit for their own accounts and acting as broker-dealers, agents or futures commissions merchants for customers.

### a.  BP

240.    Defendant BP actively trades in the global commodity markets "in order to manage, transact and hedge the crude oil, refined products and natural gas that the group either produces or consumes in its manufacturing operations."[7] As detailed in its 2012 Annual Report, BP trades Brent futures and options on exchanges including those listed on the ICE and NYMEX exchanges.[8] Plaintiffs allege that Brent Crude futures and options are among the products traded by BP.

### b.  Morgan Stanley

241.    As detailed in its 2012 Annual Report, Morgan Stanley "trades and is a market-maker in exchange-traded options and futures and OTC options and swaps on commodities, and offers counterparties hedging programs relating to production, consumption, reserve/inventory

---

[6]    *See Shell Wins 25% Cut in Bitumen Cartel Fine, Total Loses Bid*, Bloomberg Business Week (Sept. 12, 2012), http://www.businessweek.com/news/2012-09-27/shell-wins-25-percent-cut-ineu-bitumen-cartel-fine-as-total-loses-bid.

[7]    BP, Annual Report (Form 20-F) (Mar. 6, 2013), at 98.

[8]    *Id.*

management and structured transactions, including energy-contract securitizations and monetization."[9]

242.    Additionally, Morgan Stanley's broker-dealer affiliates Morgan Stanley & Co. LLC and Morgan Stanley Smith Barney LLC are future commission merchants that are regulated by the CFTC and various commodity futures exchanges.[10] Plaintiffs allege that Brent Crude futures and options are among the products traded by Morgan Stanley.

### c.  Phibro

243.    Defendant Phibro "trades on the New York Mercantile Exchange (NYMEX) division of the CME, ICE Futures Europe (ICE), the Dubai Mercantile Exchange (DME) and other exchanges, as well as in the over-the-counter physical, swaps and options markets."[11]

244.    Additionally, Phibro's corporate parent, Occidental Petroleum routinely trades "derivative instruments, including a combination of short-term futures, forwards, options and swaps, to establish, as of the date of production, the price it receives and to improve realized prices for oil and gas."[12] Plaintiffs allege that Brent Crude futures and options are among the products traded by Phibro.

### d.  Shell

245.    Shell operates a 24-hour global trading network and actively participates in trading in the crude oil markets. In the United States, "Shell Trading US conducts a substantial

---

[9]    Morgan Stanley, Annual Report (Form 10-K) (Feb. 25, 2013), at 3.

[10]    *Id.* at 15.

[11]    http://www.phibro.com/2a-energy.htm.

[12]    Occidental Petroleum Corporation, Annual Report (Form 10-K), at 34 (Feb. 26, 2013).

trading-for-profit business, which includes the buying and selling of crude oil, . . . , as well as trading oil futures."[13]

246.     Plaintiffs allege that Brent Crude futures and options are among the products traded by Shell and its affiliates.

### e.  Statoil

247.     Defendant Statoil actively participates in trading Brent Crude Oil products. As detailed in its Annual Report, "[t]o manage short-term commodity risk, Statoil enters into commodity-based derivative contracts, including futures, options, over-the-counter (OTC) forward contracts, market swaps and contracts for differences related to crude oil, petroleum products, natural gas and electricity."[14] Statoil further acknowledged that it traded derivatives on ICE and NYMEX.[15] Plaintiffs allege that Brent Crude Oil futures and options are among the products traded by Statoil.

### f.  Trafigura

248.     According to Vitol's website, the company "is a significant participant in global crude oil markets and crude oil is the largest part of Vitol's total energy portfolio," and trades "around 2.4 m barrels per day."    As described by a 2010 CFTC enforcement order, Vitol, Inc. and a Bermuda-based affiliate, Vitol Capital Management Ltd., trade NYMEX energy futures and options on futures markets.

249.     Trafigura's trading operations are integrated with its local storage, shipping, and chartering departments which enables the company "to react quickly to shifting demand

---

[13]      http://www.shell.com/global/products-services/solutions-for-businesses/shipping-trading/about-shell-trading.html.

[14]      Statoil, Annual Report (Form 20-F) (Mar. 21, 2013), at 172.

[15]      *Id.*

patterns."[16] Plaintiffs allege that Brent Crude futures and options are among the products traded by Trafigura and its affiliates.

### g. Vitol

250. According to Vitol's website, the company "is a significant participant in global crude oil markets and crude oil is the largest part of Vitol's total energy portfolio," and trades "around 2.4 m barrels per day."[17] As described by a 2010 CFTC enforcement order, Vitol, Inc. and a Bermuda-based affiliate, Vitol Capital Management Ltd., trade NYMEX energy futures and options on futures markets.[18] Indeed, in February 2011, Vitol's CEO Ian Taylor suggested that "the more reliable Brent futures contract will take center stage."[19]

251. Plaintiffs allege that Brent Crude futures and options are among the products traded by Vitol.

## V. DEFENDANTS' CONDUCT HAD A DIRECT, SUBSTANTIAL, AND REASONABLY FORESEEABLE EFFECT ON U.S. COMMERCE

252. Brent Crude Oil and Brent Crude Oil futures contracts are each a commodity that trades in U.S. interstate and foreign commerce. Defendants' restraint of trade and manipulation of Brent Crude Oil and Brent Crude Oil futures contract prices had direct, substantial, and reasonably foreseeable effects in the United States, and on Plaintiffs and members of the Class.

253. Brent Crude Oil futures contracts are traded domestically on NYMEX and on electronic boards of trade and exchanges, such as ICE, which are readily accessible within the United States. Defendants, as sophisticated Brent Crude Oil market participants, knew, or had

---

[16] "Infrastructure," http://www.trafigura.com/trading/oil-and-petroleum/crude/.

[17] *See* http://www.vitol.com/crude-oil.html.

[18] *See In the Matter of Vitol Inc. and Vitol Capital Management Ltd.,* CFTC Dkt. No. 10-17 (Sept. 14, 2010).

[19] *See* Grant Smith, "Vitol's Taylor Expects More OPEC Oil, Brent to Slide to $90-$100," Bloomberg (Feb. 22, 2011), http://www.bloomberg.com/news/2011-02-22/vitol-s-taylor-expects-more-opec-oil-brent-to-slide-to-90-100.html.

1141196.4

good reason to know, that Brent Crude Oil prices published and compiled by Platts are disseminated in the United States and are used to price, settle, and benchmark Brent Crude Oil futures contracts and/or other Brent Crude Oil derivative contracts traded in the United States.

254.    For these reasons, Defendants knew, or had good reason to know and were reckless in not knowing, that misreporting the price of Brent Crude Oil to Platts, as well as other manipulative and collusive conduct in the Brent Crude Oil market, would, and did, have direct, substantial and reasonably foreseeable effects in the United States, including, without limitation, on the prices of Brent Crude Oil futures contracts transacted domestically.

## VI.    EQUITABLE TOLLING AND FRAUDULENT CONCEALMENT

255.    Plaintiffs disclaim any burden to plead facts regarding the statute of limitations.

256.    Defendants concealed their wrongdoing in the Brent Crude Oil market. Plaintiffs could not in the exercise of due diligence have discovered Defendants' wrongdoing as alleged herein.

257.    Defendants' fraudulent concealment tolled the statute of limitations as to the claims asserted by Plaintiffs and members of the Class. Plaintiffs and members of the Class had no knowledge of the unlawful conduct alleged in this Complaint, or of any facts that could or would have led to the discovery thereof, until at least on or about May 14, 2013, when the EC confirmed that it had carried out unannounced inspections at the premises of several companies in order to obtain documents relating to contrived reporting to move or manipulate Brent crude oil prices.

258.    By its very nature, as alleged herein, the unlawful activity that Defendants engaged in was self-concealing. Defendants, among other things, conspired and engaged in secret activities in order to manipulate, through contrived reports to PRAs, Brent Crude Oil prices and the prices of Brent Crude Oil futures contracts traded on the ICE and NYMEX.

1141196.4

259. Defendants employed acts and techniques that were intended to conceal the existence of such illegal conduct. Thus, Plaintiffs and the members of the Class could not have discovered the existence of this unlawful conduct any earlier than its public disclosure in May 2013.

260. For these reasons, among others including those alleged herein and presently unknown to Plaintiffs and members of the Class, the statute of limitations applicable to Plaintiffs and the Class' claims was tolled and did not begin to run until May 2013.

## VII.   RELEVANT MARKET

261. The relevant market in this case is the Brent Crude Oil Market, which comprises: (1) the Brent Crude Oil physical cargo market; (2) NYMEX Brent Futures, ICE Brent Futures and other Brent Crude Oil derivatives; and (3) the Platts MOC market for various types of Brent Crude Oil physical cargoes and derivatives thereon.

## VIII.   CLASS ALLEGATIONS

262. Plaintiffs bring this action on behalf of themselves, and all others similarly situated, as a class action pursuant to Rule 23 of the Federal Rules of Civil Procedure ("FRCP"). The Class consists of:

> All persons, corporations and other legal entities that transacted in and/or held (a) ICE Brent Crude Oil futures contracts and/or (b) NYMEX Brent Crude Oil futures contracts during the Class Period (*i.e.*, 2002 through the present). Excluded from the Class are Defendants and any parent, subsidiary, affiliate, employee or agent of any Defendant.

263. FRCP Rule 23(a)(1). Class members number in the hundreds or, perhaps, thousands, and are geographically dispersed such that joinder is impractical.

264. FRCP Rule 23(a)(2). Common issues of fact and law include but are not limited to:

1141196.4

a. Whether Defendants manipulated Dated Brent prices and price trends and manipulated ICE Brent Crude Oil contracts and/or NYMEX Brent Crude Oil contracts in violation of the CEA;

b. Whether Defendants are liable under the CEA for such manipulation;

c. Whether Defendants are vicariously liable for such manipulation, or liable for aiding and abetting such manipulation;

d. Whether Defendants' unlawful actions violate Sections 1 and 2 of the Sherman Antitrust Act;

e. Whether such injury or the extent of such artificiality may be established by common, class-wide means, including, for example, by regression analysis, econometric formula, or other economic tests;

f. Whether Defendants unjustly enriched themselves or are otherwise responsible for disgorgement/restitution under the common law;

g. The operative time period and extent of Defendants' violations; and

h. The appropriate relief.

265. Rule 23(a)(3). Plaintiffs' interests are typical of, and not antagonistic to the interests of, the Class.

266. Rule 23(a)(4). Plaintiffs are not antagonistic to the Class, are an adequate class representative, and have retained adequate counsel.

267. Rule 23(b)(3). Common issues predominate over individual issues (if any). A class action is superior to other methods (if any) for a fair and efficient adjudication of this case. Indeed, a class action is the only method by which Plaintiffs and the Class can efficiently seek redress because of "negative value" claims. The records of commodity futures traders are

72

required to be maintained by futures commission merchants. Plaintiffs do not anticipate any difficulties in the identification of Class members, notice to Class members or other aspects of the management of this action as a class action.

## IX.    CLAIMS FOR RELIEF

### FIRST CLAIM FOR RELIEF
### (Manipulation In Violation of the
### Commodity Exchange Act, 7 U.S.C. §§ 1, *et seq.*)
### Against All Defendants

268.    Plaintiffs re-allege and incorporate all above allegations.

269.    By their intentional misconduct, Defendants each violated Section 9(a)(2) of the CEA, 7 U.S.C. § 13(a)(2), and caused prices of Brent Crude Oil and Brent Crude Oil futures contracts to be artificial during the Class Period. Defendants, through their acts that occurred between 2002 and the present, specifically intended to and did cause unlawful and artificial prices of Brent Crude Oil, ICE Brent Crude Oil contracts and/or NYMEX Brent Crude Oil contracts in violation of CEA, 7 U.S.C. §§ 1, *et seq.*

270.    Defendants' trading and other activities alleged herein constitute market power manipulation of the prices of Brent Crude Oil futures contracts in violation of Sections 9(a) and 22(a) of the CEA, 7 U.S.C. §§ 13(a) and 25(a).

271.    Defendants' extensive manipulative conduct deprived Plaintiffs and other traders of a lawfully operating market during the Class Period.

272.    Defendants acted for one another, including as alleged herein. In all the circumstances previously alleged, each Defendant had the ability to cause and did cause artificial prices.

273.    Plaintiffs and others who transacted in Crude Oil futures, including, Brent Crude Oil futures contracts during the Class Period transacted at artificial and unlawful prices resulting

73

from Defendants' manipulations in violation of the CEA, 7 U.S.C. § 1, *et seq*., and as a direct result thereof were injured and suffered damages.

274. Plaintiffs and the Class are each entitled to damages for the violations of the CEA alleged herein.

275. Defendants' conduct proximately caused injury to Plaintiffs and other members of the Class who transacted in an artificial and manipulated market, at manipulated prices, and with artificial price trends, during the Class Period.

276. Plaintiffs and members of the Class who purchased or sold Crude Oil futures contracts, including Brent Crude Oil futures contracts on NYMEX or ICE during the Class Period were injured and are each entitled to their actual damages for the violations of the CEA alleged herein.

### SECOND CLAIM FOR RELIEF
### (Manipulation by False Reporting and Fraud and Deceit In Violation of the Commodity Exchange Act, as Amended, 7 U.S.C. §§ 1, *et seq.* and Rule 180.1(a)) Against All Defendants

277. Plaintiffs re-allege and incorporate all allegations with the same force and effect as if fully restated herein.

278. By their intentional and reckless misconduct, Defendants each violated Section 6(c)(1) of the CEA, as amended, 7 U.S.C. § 9, and caused prices of Brent Crude Oil futures contracts, including ICE Brent Crude Oil contracts and/or NYMEX Brent Crude Oil contracts, to be artificial during the Class Period. Defendants delivered and caused to be delivered for transmission through the mails and interstate commerce, by multiple means of communication, including communications to Platts, a false or misleading or inaccurate report concerning market information or conditions that affect or tend to affect the price of Brent Crude Oil and Brent

74

Crude Oil futures, which are commodities in interstate commerce, knowing, or acting in reckless disregard of the fact that such report was false, misleading or inaccurate.

279. Under Section 6(c)(1) of the CEA, as amended, codified at 7 U.S.C. § 9, and Section 22 of the CEA, as amended, 7 U.S.C. § 25, it is unlawful for any person, directly or indirectly, to use or employ or attempt to use or employ, in connection with any swap, or a contract of sale of any commodity in interstate commerce, or for future delivery on or subject to the rules of any registered entity, any manipulative or deceptive device or contrivance, in contravention of such rules and regulations as the Commodity Futures Trading Commission ("CFTC"), which shall promulgate by not later than 1 year after July 21, 2010.

280. In July 2011, the CFTC promulgated Rule 180.1(a), 17 C.F.R. § 180.1(a) (2011), which provides, in relevant part:

> It shall be unlawful for any person, directly or indirectly, in connection with any swap, or contract of sale of any commodity in interstate commerce, or contract for future delivery on or subject to the rules of any registered entity, to intentionally or recklessly use or employ, or attempt to use or employ, any manipulative device, scheme, or artifice to defraud, make, or attempt to make, any untrue or misleading statement of a material fact or to omit to state a material fact necessary in order to make the statements made not untrue or misleading.

281. Unlawful manipulation under the CEA, as amended, and Rule 180.1 includes delivering, or causing to be delivered for transmission through the mails or interstate commerce, by any means of communication whatsoever, a false or misleading or inaccurate report concerning market information or conditions that affect or tend to affect the price of any commodity in interstate commerce, knowing, or acting in reckless disregard of the fact that such report is false, misleading or inaccurate.

282. During the Class Period, Defendants used or employed manipulative or deceptive devices or contrivances, in connection with a contract of sale of Brent Crude Oil in interstate commerce, including, but not limited to, making untrue or misleading statements of material

75

facts, or omitting material facts necessary to make the statements made not misleading, including:

   a. Making untrue or misleading statements to Platts during the MOC window regarding their BFOE transactions;

   b. Failing to disclose, and omitting, that they entered wash transactions;

   c. Failing to disclose, and omitting, that they were unlawfully conspiring between and among themselves to manipulate Brent Crude Oil prices;

   d. Failing to disclose, and omitting, that they were reporting bids, offers and transactions to Platts during the MOC process to move Brent Crude Oil prices to benefit their derivative positions;

   e. Issuing statements and directly engaging in the acts alleged herein knowingly or with reckless disregard for the truth;

   f. employing other deceptive devices as described above.

283.   Defendants' conduct proximately caused injury to Plaintiffs and other members of the Class who transacted in an artificial and manipulated market, at manipulated prices, and with artificial price trends, during the Class Period.

284.   Plaintiffs and the Class are each entitled to damages for the violations of the CEA alleged herein.

**THIRD CLAIM FOR RELIEF**
**(Principal-Agent Liability In Violation of the**
**Commodity Exchange Act, 7 U.S.C. §§ 1, *et seq.*)**
**Against all Defendants**

285.   Plaintiffs re-allege and incorporate all allegations with the same force and effect as if fully restated herein.

1141196.4

286. Defendants BP, Shell, and Statoil and others were each an agent and/or other person on behalf of the other Defendants. Because they acted pursuant to and were members of a conspiracy and unlawful agreement, Defendants acted as one another's agents during the Class Period.

287. This included when Defendants, through their employees, agents and/or others directed, developed, executed and otherwise acted with respect the scheme alleged herein. Under Section 2(a)(1)(B) of the CEA, 7 U.S.C. § 2(a)(1)(B), each of the aforementioned Defendants is liable for the acts of its employees, agents and/or another person acting for it in the scope of their employment.

288. Plaintiffs and Class members are each entitled to damages for the violations alleged herein.

## FOURTH CLAIM FOR RELIEF
### (Aiding and Abetting Liability In Violation of the Commodity Exchange Act, 7 U.S.C. §§ 1, *et seq.*) Against All Defendants

289. Plaintiffs re-allege and incorporate all allegations of this Complaint with the same force and effect as if fully restated herein.

290. All Defendants are also liable for aiding and abetting manipulation.

291. Each and every Defendant had extensive knowledge of the manipulation and, with such knowledge, materially assisted the manipulation by the other Defendants.

292. Each Defendant made and benefited from the manipulative acts and willfully aided, abetted, counseled, induced, and/or procured the commission of violations of the CEA by the other Defendants.

1141196.4

293. Each Defendant supervised the making of and benefited from the manipulative acts and willfully aided, abetted, counseled, induced, and/or procured the commission of violations of the CEA by the other Defendants.

294. Each Defendant, by and through their respective partners, agents, employees and/or other persons, benefited from the manipulative acts and willfully aided, abetted, counseled, induced, and/or procured the commission of violations of the CEA by the other Defendants.

295. Each Defendant participated in the development of the manipulative scheme and participated in the execution of, and supervised, the manipulative acts. Each Defendant also benefited from the manipulative acts and willfully aided, abetted, counseled, induced, and/or procured the commission of violations of the CEA by the other Defendants.

296. Defendants each played their component role and each knowingly aided, abetted, counseled, induced, and/or procured the violations alleged herein. Defendants did so knowing of each other's manipulation of Brent Crude Oil market prices, and willfully intended to assist these manipulations, which resulted in Brent Crude Oil futures contracts to reach artificial levels during the Class Period in violation of Section 22(a)(1) of the CEA, 7 U.S.C. § 25(a)(l).

297. Plaintiffs and Class members are each entitled to actual damages for the violations of the CEA alleged herein.

### FIFTH CLAIM FOR RELIEF
**(Contract Combination or Conspiracy to Manipulate**
**Prices in Violation of Section 1 of the Sherman Act,**
**15 U.S.C. § 1)**
**Against All Defendants**

298. Plaintiffs re-allege and incorporate all allegations of this Complaint with the same force and effect as if fully restated herein.

1141196.4

299. Defendants constituted and/or entered into a contract, combination or conspiracy in restraint of trade, i.e., to manipulate or fix prices of ICE Brent Crude Oil contracts and/or NYMEX Brent Crude Oil contracts during the Class Period in violation of Section 1 of the Sherman Act and Section 4 of the Clayton Act.

300. During the Class Period, Defendants possessed market power in the setting of Brent Crude Oil prices and the prices of Brent Crude Oil futures contracts.

301. The conspiracy consisted of a continuing agreement, understanding or concerted action between and among Defendants and their co-conspirators in furtherance of which Defendants fixed, maintained, suppressed and/or made artificial Brent Crude Oil market prices and the prices of Brent Crude Oil futures contracts. Defendants' conspiracy is a *per se* violation of the federal antitrust laws and is, in any event, an unreasonable and unlawful restraint of trade.

302. Each of the Defendants acted with full awareness of the anticompetitive purpose of the conduct they were entering into and the manner thereof. Defendants exercised their independent judgment and skill to effectuate the purposes of the unlawful restraint of trade, i.e., to manipulate and set the prices of ICE Brent Crude Oil contracts and/or NYMEX Brent Crude Oil contracts during the Class Period.

303. Defendants' violations substantially affected interstate trade and commerce and caused antitrust injury to Plaintiffs and all Class members.

304. ICE Brent Crude Oil contracts and/or NYMEX Brent Crude Oil contracts are traded throughout the United States in interstate commerce. During the Class Period, Plaintiffs and members of the Class transacted in and/or held ICE Brent Crude Oil contracts and/or NYMEX Brent Crude Oil contracts at prices that were set and otherwise made artificial as a result of Defendants' unlawful acts.

1141196.4

305. During the Class Period, Defendants acted in interstate commerce within the United States.

306. Defendants' contract, combination, and conspiracy unreasonably restrained trade and commerce, made artificial the prices of ICE Brent Crude Oil contracts and/or NYMEX Brent Crude Oil contracts, and caused misleading signals to be sent to market participants.

307. As a proximate result of Defendants' unlawful conduct, Plaintiffs and members of the Class have suffered injury to their business or property. Plaintiffs and the Class are each entitled to treble damages for the Defendants' violations of the Sherman Act alleged herein, and a permanent injunction restraining Defendants from engaging in additional anticompetitive conduct.

### SIXTH CLAIM FOR RELIEF
#### (Violation of Section 2 of the Sherman Act,
#### 15 U.S.C. § 2)
#### Against All Defendants

308. Plaintiffs re-allege and incorporate all allegations of this Complaint with the same force and effect as if fully restate herein.

309. In violation of Section 2 of the Sherman Act and Section 4 of the Clayton Act, Defendants entered monopolized and conspired to monopolize the Brent Crude Oil Market.

310. During the Class Period, as major producers and market participants and contributors to Platts pricing assessments for Brent Crude Oil, Defendants attempted to monopolize and did monopolize the Brent Crude Oil Market, including the MOC.

311. During the Class Period, Defendants controlled the delivery points and the trading in the MOC process. They therefore also controlled prices in the market for Brent Crude Oil-based derivative contracts, including futures contracts. Defendants' unlawful price control of the Brent Crude Oil Market during the Class Period reflects monopoly power. The conduct consisted

80

of a concerted effort between and among Defendants and their co-conspirators and in furtherance of which they created artificial prices for Brent Crude Oil-based derivative contracts, including futures contracts.

312. During the Class Period, Defendants provided Platts during the MOC process with physical or derivative transaction data based on false, inaccurate or misleading information for the purpose of affecting Brent Crude Oil prices.

313. Defendants' conduct and its resulting impact on the Brent Crude Oil Market occurred in or affected interstate and international commerce.

314. The anticompetitive effects of Defendants' conduct far outweigh any ostensible competitive benefits or justifications.

315. Plaintiffs and members of the Class have been injured in their business or property by Defendants' attempted monopolization and monopolization of the Brent Crude Oil Market.

316. Defendants' anticompetitive conduct had severe adverse consequences on competition and price discovery. Plaintiffs and other members of the Class that traded Brent Crude Oil futures and futures linked to the price of Dated Brent during the Class Period were deprived of normal, competitive trading patterns and, instead, were subjected to artificially determined prices as a result of Defendants' unlawful and manipulative conduct. As a consequence thereof, Plaintiffs and the Class suffered financial losses and were, therefore, injured in their business or property.

317. Plaintiffs and members of the Class are each entitled to treble damages for the violations of the Sherman Act alleged herein.

1141196.4

## SEVENTH CLAIM FOR RELIEF
### (Unjust Enrichment And Restitution/Disgorgement)
### Against All Defendants

318.    Plaintiffs re-allege and incorporate all allegations of this Complaint with the same force and effect as if fully restated herein.

319.    Defendants financially benefited from their unlawful acts, and it is unjust and inequitable for Defendants to have enriched themselves in this manner.

320.    These unlawful acts caused Plaintiffs and other members of the Class to suffer injury, lose money, and transact Brent Crude Oil futures contracts at artificial prices.

321.    Commodity futures contract trading is a zero sum game. To the extent that Defendants benefited from their extensive unlawful acts, they necessarily did so by forcing Plaintiffs and members of the Class to lose.

322.    All traders enter the same standardized contract subject to the same rule set. This prominently includes rules and laws prohibiting manipulation.

323.    It would be inequitable for Defendants to be permitted to violate that rule set and still retain the benefit that Defendants obtained from such violation at the expense of Plaintiffs and members of the Class.

324.    Equity and good conscience require restitution by Defendants.

325.    Each Defendant should pay restitution or its own unjust enrichment to Plaintiffs and members of the Class.

326.    Plaintiffs and members of the Class are entitled to the establishment of a constructive trust impressed on the benefits to Defendants from their unjust enrichment and inequitable conduct.

1141196.4

## X.  PRAYER FOR RELIEF

WHEREFORE, Plaintiffs pray for judgment against Defendants as follows:

A.  For an order certifying this lawsuit as a class action pursuant to Rules 23(a) and (b)(3) of the Federal Rules of Civil Procedure and designating Plaintiffs as Class Representatives and their counsel as Class Counsel;

B.  For judgment awarding Plaintiffs and the Class damages against Defendants for their violations of the CEA, together with prejudgment and post-judgment interest at the maximum rate allowable by law;

C.  For a judgment awarding Plaintiffs and the Class treble damages against Defendants as a result of their unlawful, anticompetitive conduct alleged herein under applicable federal antitrust law;

D.  For a judgment awarding Plaintiffs and the Class the amount of Defendants' unjust enrichment;

E.  For an award to Plaintiffs and the Class of their costs of suit, including reasonable attorneys' and experts' fees and expenses; and

F.  For such other and further relief as the Court may deem just and proper.

1141196.4

## DEMAND FOR JURY TRIAL

Plaintiffs hereby demand a jury trial.

Dated: November 19, 2013

Respectfully submitted,

**LIEFF CABRASER HEIMANN & BERNSTEIN, LLP**

By: _____
Steven E. Fineman (SF 8481)

Steven E. Fineman (SF 8481)
Douglas I. Cuthbertson (DC 1004)
250 Hudson Street, 8th Floor
New York, NY 10013
Tel:   (212) 355-9500
Fax:   (212) 355-9592

**LIEFF CABRASER HEIMANN & BERNSTEIN, LLP**
Eric B. Fastiff
Brendan P. Glackin (BG 7314)
275 Battery Street, 29th Floor
San Francisco, CA 94111-3339
Tel:   (415) 956-1000
Fax:   (415) 956-1008

*Counsel for Plaintiffs and the Proposed Class*

1141196.4